# Court of Appeals.

*June*, 1889.

## PEOPLE *v.* BECKWITH.

MURDER.—QUALIFICATIONS OF JURORS.—APPLICATION OF THE PENAL CODE, §§ 2, 181.—WHAT FACTS SHOW PRE-MEDITATION AND DELIBERATION.

Section 181 of the Penal Code,—which as amended in 1882 required that the death of the person alleged to have been killed and the fact of the killing by the defendant as alleged must be established as independent facts, the former by direct proof, and the latter beyond a reasonable doubt,—is a rule of evidence applicable upon a trial to all cases within its terms, and is not dependent upon the time of the commission of the offense, whether before or after the taking effect of the Penal Code.

Section 2 of the Penal Code,—providing that " any act or omission begun prior to " the time of taking effect " of that code should be inquired, prosecuted, and punished in the same manner as if this code had not been passed,"—does not relate to or include the evidence which may be given or the degree of proof required upon an inquiry or during a prosecution to secure a conviction and punishment for crime.

The evidence in the present case disclosed threats to kill the deceased, repeated up to within a short time of the homicide, and that defendant did kill the deceased by striking him first from behind with a knife, and then striking him with an axe, that he afterwards mutilated the body for the purpose of burning it, attempted to destroy it, especially such parts as contained peculiar marks, as the head, the hand, and the foot, and the same day, being discovered burning parts of the body in the stove, he told a falsehood about it, and stated that the deceased had gone away, and then himself took flight, taking with him all articles of use or value from the pockets of the dead man. *Held*, that these circumstances were sufficient to lead the jury to the conclusion that there was on the part of the defendant, malice and

intention to kill, and that the killing by him of the deceased was in pursuance of premeditation and deliberation rather than the effect of sudden anger without design.

Appeal from a judgment of the General Term of the Supreme Court in the Third Department, entered upon an order made July 11, 1887, which affirmed a judgment of the Court of Oyer and Terminer of Columbia County entered February 11, 1887, upon the conviction of defendant, Oscar F. Beckwith, of murder in the first degree.

The defendant having been convicted of murder in the first degree, the conviction was affirmed in the General Term of the Supreme Court (4 *N. Y. Crim. Rep.* 335) and by the Court of Appeals (5 *Id.* 222). Afterward defendant made a motion for a new trial, which was granted. An appeal from the order granting the new trial was dismissed (see 5 *N. Y. Crim. Rep.* 232), and on another trial defendant was again convicted of murder in the first degree.

Upon appeal to the General Term of the Supreme Court from the last conviction, the following opinions were written:

LANDON, J.—The prisoner was convicted of murder in the first degree. The indictment charged that Simon A. Vandercook was the person murdered. We are confronted upon the threshold of our examination with the objection that the statute requires direct proof of the death of the person alleged to have been killed, and it is alleged that there is no direct proof that Simon A. Vandercook, the person here alleged to have been killed is dead. There is direct proof that a man in many respects resembling Simon A. Vandercook is dead; there is circumstantial evidence sufficient to satisfy the mind beyond a reasonable doubt that such person was Simon A. Vandercook; but the question remains, is there such direct proof of his death as the statute requires?

Section 181 of the Penal Code provides: " No person

can be convicted of murder or manslaughter, unless the death of the person alleged to have been killed, and the fact of the killing by the defendant as alleged are established as independent facts ; *the former by direct proof, and the latter* beyond a reasonable doubt. This section of the Penal Code, as enacted in 1881, did not contain the words which we have placed in *italics;* these were added by amendment in 1882.

This homicide was committed on the 10th day of January, 1882. The Penal Code, although passed July 26, 1881, did not, according to its last section (727) take effect until the first day of December, 1882, and when it took effect, section 181 had already been amended in the particular mentioned. But section 2 provides that " Any act or omission begun prior to that day (Dec. 1, 1882) may be inquired of, prosecuted and punished in the same manner as if this code had not been passed." The identity of the dead body as the body of Vandercook might, therefore, be established as at common law.

The commissioners, in framing the section as it was enacted in 1881, as we learn from the note appended to section 238 of their draft of the Penal Code, as published in 1864, intended to state the rule as announced in Ruloff's case (18 *N. Y.* 179). But it is manifest that they failed to do so. The rule in Ruloff's case was announced to be that a conviction of murder cannot be permitted " without direct proof of the death, or of the violence or other act of the defendant which is alleged to have produced death." This direct proof of the death was declared to be either the production of the dead body or direct proof of the violence which caused the death and also caused the destruction or disappearance of the body, so that it could not be produced, as in the case of sinking the body in the sea, or consuming it by fire.

But section 181 really permitted proof of the death by circumstantial evidence, because circumstantial evidence, if sufficient and convincing, is competent, unless the statute

forbids, to prove any fact beyond a reasonable doubt. It was obviously intended by the amendment of 1882 to make the section actually conform to the rule, with respect to death, which is announced in Ruloff's case. But the section, as it now stands, requires direct proof, not only of the death, but also of the identification of the dead body found or produced with the person named in the indictment as the person killed.

Ruloff was convicted of the murder of his child. The dead body of his child was never found, and there was no direct evidence of his murderous violence to the child, or of his destruction of, or secreting its body. But there was indirect or circumstantial evidence sufficient to satisfy the jury that he first murdered his child, placed it in a box and put iron enough in the box to make it sink in the water, and sunk it in the deep water of a lake. But the Court of Appeals reversed the conviction, holding that until direct proof of death was adduced either by proof of finding the dead body, or of the violence which caused its death, there was no occasion to inquire into the guilty agency of the prisoner.

The question of the identification of a dead body with a person named in the indictment as having been killed did not arise in the case. Such a question, however, did arise in Dr. Webster's case (5 *Cush.* 295), and circumstantial evidence or indirect proof was resorted to, to establish the identity of the nearly-consumed remains of Parkman, the man alleged to have been murdered. Also in People *v.* Wilson (3 *Park.* 199); Regina *v.* Cheverton (2 *Foster & F.* 833); *Greenleaf on Evidence* (vol. 3) states the rule thus: " Sec. 133. But though it is necessary that the body of the deceased be satisfactorily identified, it is not necessary that this be proved by direct and positive evidence, if the circumstances be such as to leave no reasonable doubt of the fact."

The identity of the dead body of Simon A. Vandercook was, by the evidence adduced, established beyond a reason-

able doubt. As the homicide was committed before the Penal Code took effect, we think it was competent to establish the identity by presumptive proof, that is, by facts and circumstances tending to establish the identity, and sufficiently convincing to exclude all reasonable doubt. But if the case should be governed by section 181 of the Penal Code, we do not think direct proof of identity should be held to exclude the points and features of resemblance, and circumstances tending to establish identity.

Here the head of the dead body had been consumed by fire. One of Vandercook's hands and one of his feet had peculiar marks as of some injury. The corresponding hand and foot of this dead body had also been consumed. Witnesses to whom the head and hand were familiar, might well hesitate to testify directly "this is the body of Vandercook," and yet be able to give direct evidence of facts and circumstances amounting to what we usually call presumptive or circumstantial proof of identity, and which might be sufficiently convincing to satisfy the mind beyond all reasonable doubt. Indeed, one witness might give one fact, and another witness another, and the sum of the facts might make a much stronger case for the jury than some witnesses would need to enable them to say, "this is the dead body of Vandercook." In whatever form stated, proof of identity in such cases is a matter of opinion based upon the witnesses' impression of the sameness of, or resemblance between the body seen, and his mental picture of the person alleged to have been killed. However directly he may testify, he gives but an opinion or impression induced by the facts upon his mind. When he says, "this body is Vandercook," he means, "I think it is; I believe it is," and strictly speaking we have only direct proof of what he thinks and what he believes, not what the fact actually sought is. Hence we think when the legislature required direct proof of the identity, they could not have intended to require any higher proof than the nature of the case would admit of. Such

proof was given in this case, and we think justified the finding of the fact of the identity.

It is objected, that conceding that the defendant killed Vandercook, there is no evidence of the "deliberate and premeditated design to effect his death" requred by the statute (Penal Code, § 183), or, if any, not sufficient to justify a conviction of murder in the first degree.

The defendant lived alone in a small cabin on a mountain near what he supposed to be a gold mine which he had discovered. A company had been formed which obtained the title to the mine and land about it. Vandercook became the manager of the mine, and the defendant either was, or supposed he was, excluded from any interest in it. Vandercook boarded in the family of Harrison Calkins, who lived about half a mile away. He had boarded there about three years before the homicide. Not much work had been done in the mine, but Vandercook cut off the wood from the lot, and used the proceeds. The defendant became dissatisfied and had said to others regarding Vandercook that he would like to put him out of the way and suck his heart's blood; that he would like to get some one to do it; that any one who knocked Vandercook over would get two or three hundred dollars. Some of these statements were repeatedly made. Vandercook was last seen alive at about eleven o'clock in the forenoon on January 10, 1882, near the cabin of the defendant. Two days later some neighbors broke into this cabin and found there Vandercook's dead body, with the exception of his head, left hand, one foot, and part of his spinal column. The body had been cut into lengths or pieces apparently to fit them to be burned in the stove which was in the cabin. The examination of the ashes in the stove disclosed charred fragments of bones, apparently those of the missing parts of the body, also woolen clothing. About four o'clock of the afternoon of the 10th of January, Beckwith called at the house of Mr. Calkins, and stated to Mrs. Calkins that Vandercook had gone away with a man from Green River to get up a stock company, and would

not be back until March.   Mr. Calkins visited the defendant in his cabin that evening.   As he approached it he perceived an unusual odor as of something burning.   When he entered the cabin he found the stove red hot, and heard something frying or crackling within it, and, upon asking defendant the cause, the defendant answered that he was burning pork rinds.   Calkins went away, and the defendant was not again seen in that neighborhood.   It subsequently transpired that he went to Canada and lived there under the name of White. When he was arrested, some small articles, identified as Vandercook's, were found in his possession.   The examination of the body of Vandercook disclosed a cut, as of a knife, entering the back beneath the shoulder blade and penetrating to the right lung.   The physician testified that the ecchymosed condition of the lung indicated that Vandercook was alive when he received this cut; that it would greatly shock and weaken, but would not instantly kill him.   Two axes were found in the cabin, one much covered with flesh; on the head of the other were a few short gray hairs.   Vandercook's hair was short and gray.   The defendant, being in jail, stated to some visitors that Vandercook came to his cabin; that they had a tussle, and that Vandercook got the worst of it; that Vandercook got killed in his house; that he knew who did it, but he did not; that he got chopped up.   With respect to the defendant's statement it is proper to say that while the law requires all of it to be considered, it is powerless to compel a jury to believe the portions of it that they discredit.

Vandercook was a much larger, stronger and more active man than the defendant.   The jury obviously came to the conclusion that the threats of the defendant indicated his hostile feeling towards Vandercook, that the idea of killing him was often presented to his mind, and was much deliberated upon by him.   That when Vandercook came to his cabin, whether an altercation or tussle occurred between them or not, the defendant took his opportunity to stab him in the back; that this wound was not sufficient to kill him

instantly, and that he completed the homicide by striking him on the head with one of his axes. The other circumstances of the case no doubt strengthened their conviction of the capacity of the defendant to commit such a crime and that he did it with premeditation or deliberation. The statement of these circumstances seems to carry its own argument, and discussion is not useful. We think the evidence justifies the verdict.

Harrison Calkins was a material witness on behalf of the prosecution. On his cross-examination he testified that the relations between Vandercook and defendant were friendly so far as he knew. He was asked if he did not state to Dr. Hulette upon the highway, in the presence of Mrs. Hulette, that they (meaning himself and Vandercook) were not doing anything with the mine now, that that half-crazy Beckwith was bothering them, and they could not do anything with it. He answered that he did not remember any such remark. Mrs. Hulette was called by the defendant's counsel and asked, in substance, if Calkins did not say so? Objection being made it was sustained, and we think properly. It was competent for the prisoner's counsel to prove by the witness, by way of discrediting him, that he made a statement out of court contrary to his testimony in. If the witness should deny or testify that he did not remember making such contradictory statement, it would be competent to prove it by another witness. The prisoner's counsel here did not seek to prove, either by the witness Calkins or by Mrs. Hulette, any statement that Vandercook and defendant's relations were unfriendly, but that Calkins had said that that half-crazy Beckwith was bothering them, and they would not do anything with the mine—a statement, which, if made, was expressive of Calkins' estimate of the defendant and his conduct, but not proving that his sworn statement was opposed to his conversational one.

Whether Calkins had made the latter statement was immaterial and not the proper subject of an issue (Carpenter v. Ward, 30 N. Y. 243. The motion in arrest of judg-

ment upon the ground of irregularity does not appear to be supported by proof of the irregularity alleged.

We think the conviction and judgment should be affirmed.

·BOCKES, J., concurred.

LEARNED, J.—[Dissenting.]—Under the Revised Statutes murder was killing, perpetrated from a premeditated design to effect death.   Manslaughter in the first degree is killing when committed from a deliberate and premeditated design to effect death; in the second degree, when committed with a design to effect death, but without deliberation or premeditation.   I cannot but think that the decisions of the courts have gone far to abolish the distinction which the legislature intended to make by the emphatic adding of " deliberation" to " premeditation."    When it is said that such design must precede the killing by some appreciable space of time, but the time need not be long, that the mind works with a celerity which it is impossible to measure, and the like, it appears to me that the distinction of the statute is practically ignored.    An opinion of a court which was reached with such celerity of the working mind that only a mere " appreciable space of time " should intervene between the argument and the decision, would hardly be called a deliberated and premeditated opinion.    And in this very case an act done by the prisoner was on the former trial pronounced to be deliberate and premeditated, which was performed in so short a time that, if it had been any other act than that of taking human life, it would have been called hasty and not deliberate, suddenly conceived and not premeditated.    And if the learned judges who affirmed the former conviction had taken no more time to consider the case than the defendant took, according to the testimony, to do the act, they would not have thought that they were acting with deliberation and premeditation.    Murder by poison or lying in wait is almost necessarily deliberate and premeditated.    Murder committed during a fight or a quarrel

is not, in any fair or reasonable meaning of the words. And if it be said that one may deliberate about an act and premeditate it in any such brief time as a second or two, a mere space of time that can be appreciated, then it seems to me that the true meaning of words is disregarded. And I think that the decisions on the statute, as it now stands, show an unwillingness to accept its merciful and human consideration for hasty and suddenly conceived crime. But we must take the decisions as they are, trusting that a jury, when they deliberate on their verdict, will understand the meaning of that word.

In considering this case I assume that Vandercook was killed in Beckwith's cabin and by Beckwith's hand; that Beckwith had at some previous time threatened to take Vandercook's life ; I even assume that Beckwith's attempt to conceal the body and his flight are some evidence that he thought he had committed some crime. What is there in all these facts that is not as consistent with the theory that the crime was murder in the second degree or manslaughter in the first degree, as with the theory that the crime was murder in the first degree ? Where is the proof of the deliberate or premeditated design for even one second before the killing ? Where is the proof of the design to effect death at all ? The blow from the knife was not immediately fatal, if at all. It might have been given with a design to kill, but without deliberation or premeditation. It might have been given in the heat of passion. What right have we to say that it was not so given ? The fact that it was given upon the back does not show that it was not in the heat of passion. The previous threats showed bad feeling. And if there had been any proof that Beckwith had induced Vandercook to come to his cabin on the occasion, then it might be said that such proof showed deliberation and premeditation. But nothing of this kind appears. Vandercook may even have been an intruder and unwelcome. He may have come to irritate and abuse Beckwith. Indeed, it is given in evidence by the prosecution that Beck-

with said that Vandercook burst the door open and got hurt; that they had a tussle and Vandercook got the worst of it. Now there is nothing to contradict or discredit this statement of Beckwith put in evidence by the prosecution.

Undoubtedly previous threats may qualify and give a character to the circumstances which surrounded the killing. But in this case we do not know the circumstances. The killing may have been done in the heat of passion, without design to effect death, or even in self-defense; so that the threats (which really seem to have been idle talk) do not characterize any circumstances. If Beckwith had provided a weapon, if he had lain in wait, if he had sought Vandercook, then these threats would have had force. Two axes were found; one had hairs on it, the other flesh and blood. But it does not appear that these were used in killing Vandercook. The mutilated condition of the body sufficiently accounts for the appearance of the axes. The mutilation was done after death. I am unable to find, and I am not referred to any evidence tending to show, that Beckwith struck Vandercook, while living, a blow with an axe. In this respect the present case differs from the case as it was on the former trial. Then evidence was given by Beckwith himself, " that he killed the deceased by a blow of an axe." So it is stated by the Court of Appeals, and they say " the axe was wielded with a settled design to kill." And on this deliberate selection and use of this weapon the decision of that court largely rested. People v. Beckwith, 103 *N. Y.* 365; 5 *N. Y. Crim. Rep.* 222. No such evidence is now before us.

This is a case in which there is danger that the feelings of the jury and of the court may be excited by the mutilation committed on the body of the deceased, evidently for the purpose of concealment. But the crime had been completed before this mutilation was done. The mutilation is shocking to our sensibility and to our respect for the dead, but it does not affect the degree of the crime. An attempt to conceal evidence is some indication of guilt; yet even a

person conscious of innocence may fear the result of a trial. At any rate, the crime was done when Vandercook was killed. Whatever followed, however shocking, should not disturb our calm judgment, nor convict Beckwith of a crime greater in degree than the proof justifies. We have no right, nor had the jury, to find premeditation and deliberation without evidence; and that evidence must show that the very act of killing was done with a deliberate and premeditated design to effect death. "An act co-existent with and inseparable from a sudden impulse, although premeditated, could not be deliberate, as when under sudden and great provocation one instantly, although intentionally, kills another." But the statute is not satisfied unless the intention was deliberated upon. Leighton *v.* People, 88 *N. Y.* 117. There must, then, be evidence on which the jury could find that Beckwith not only intended to kill, but deliberated on that intention. I do not see such evidence in the case. And here it must be noticed that the court charged the jury that, in proving the statement made by defendant, as evidence of the killing of Vandercook by the defendant the people are bound by defendant's narrative in the same statement that such killing occurred in a tussle which followed Vandercook's breaking into the cabin, unless that circumstance is proved untrue by other proof; and further, that with the fresh provocation of Vandercook's breaking into the cabin, proved in this case, the jury have no right to find that the killing was upon any previous malice. The jury, therefore, was instructed to find that the killing was not of any previous malice, but occurred in a tussle which followed Vandercook's breaking into Beckwith's cabin. They must then have found the deliberation and premeditation from something which happened between the time when Vandercook burst into the door and the time when he was killed. As above remarked, there is no evidence of what took place then, except the fact of a stab with the knife.

It seems to me that the judgment should be reversed, and a new trial granted upon the facts.

Judgment and conviction affirmed.

Upon appeal to the Court of Appeals the following were the principal points of defendant, appellant.

*L. F. Longley*, for defendant, appellant.—1. The court erred in denying the defendant's motion, made at the close of the evidence for the prosecution, that the court direct an acquittal on the ground that there had not been sufficient legal proof of the *corpus delicti*. Code Crim. Proc. § 710 ; Penal Code, § 181; Ruloff *v.* People, 18 *N. Y.* 179 ; People *v.* Ruloff, 3 *Park.* 242 ; 3 *Greenl.* § 30 ; Webster's Case, 5 *Cush.* 295.

The defendant's alleged confession could not be availed of, as proof of this branch of the *corpus delicti* must be proven first. 2 *Russ. on Crimes*, 824, 826 ; Hope's Case, *Cow. Crim. Dig.* 97 ; 2 *Parker*, 14.

2. The trial court erred in denying the defendant's motion to set aside the verdict as against the weight of evidence and as not having sufficient evidence to sustain it, and this court should order a new trial, because the verdict is against the weight of evidence and against the law.

3. The verdict is against the weight of evidence. There is absolutely no proof of any criminal act to rebut the presumption of innocence which the law throws round a man from defending his house and person against a lawless assailant. *Code Crim. Proc.* § 389 ; Stokes *v.* People, 53 *N. Y.* 164. Justifiable homicide must be assumed until the contrary is proven.

The statement introduced by the people proved that Vandercook broke into the defendant's house by violence and that a conflict ensued. The defendant was thus put by this evidence in perhaps the only position in which he might legally defend himself without attempting flight, even to the

taking of the life of his assailant if necessary. 1 *Russ. Crimes*, 662; *Roscoe, Crim. Ev.* 710.

There is nothing in the case from which guilt in any degree may be even legally presumed except the defendant's concealment and flight.' These are undoubtedly indications of fear, not necessarily of guilt. *Wills Circ. Ev.* 89, 90. But even if the flight of the defendant proves guilt it does not prove guilt to the extent of murder in the first degree. It might have only proven manslaughter. *Code Crim. Proc.* § 390.

4.. The verdict is against the law. If the defendant was guilty of murder the verdict should have been in the second degree, and not in the first, because in this case there is evidence of an altercation and attack by the deceased upon the defendant. Previous expressions of ill-will, even if amounting to threats, would not alone furnish evidence that homicide was committed in pursuance of a deliberate purpose. There must be some overt act of the defendant indicating his purpose preceding the killing, such as lying in wait, providing a weapon, or seeking his victim. People v. Hovey, 27 *Hun*, 382; People v. Sindram, 88 *N. Y.* 196: People v. Majone, 91 *N. Y.* 211; 1 *N. Y. Crim. Rep.* 94; People v. Cornetti, 92 *N. Y.* 85; 1 *N. Y. Crim. Rep.* 303; People v. Leighton, 10 *Abb. N. C.* 261.

The evidence showed that upon a sudden provocation moving from the deceased, a mutual combat arose in which the deceased was killed. If the mortal stroke was not necessary, the question must be in such a case, was there time before such stroke and after the necessity for it, for the defendant's passion to cool? People v. Sullivan, 7 *N. Y.* 400; 1 *Russ. on Crimes*, 524, 525. But the provocation was proved, and there was simply no evidence on the subject of any lapse of time between the provocation and death.

*A. B. Gardenier*, district attorney, for the people, respondent.

Upon appeal to the Court of Appeals the following
opinion was written by that Court.

DANFORTH, J.—A reversal of the conviction and a new
trial is asked for upon the grounds: 1. That there is no
legal proof of the *corpus delicti*. 2. That the verdict is
against the weight of evidence and against the law.  3. That
the verdict was the result of prejudice and passion on the
part of the jury.  4. That evidence offered by the defend-
ant was improperly excluded.  5. That the officers charged
to keep the jury while deliberating upon their verdict were
not properly sworn.

There is nothing in the record to sustain this last prop-
osition.  The oath actually administered is not given, nor
is there anything before us to show that the regulation of
law in regard to it (Code of Crim. Pro. § 421) was not ob-
served.

The fourth point seems also without merit.  The evi-
dence offered and rejected is sufficiently stated by the Gen-
eral Term (45 *Hun*, 428, also *supra*, p. 147), and was
properly dealt with.  It had no relation to any question at
issue.  Nor did it affect the credibility of the witness whose
expressions in conversation were sought to be proven.
Testimony as to matters which are neither relevant nor
material is incompetent because it tends neither to establish
nor disprove anything.  The third point has no foundation.
The only fact concerning it to which our attention is direct-
ed by the appellant is that one hundred and fifty-six jurors
were called before a trial panel could be obtained. Difficulty
in procuring persons qualified to sit is no evidence that the
jurors actually chosen, and thus pronounced free from "all
legal objections" and to be men "of approved integrity and
sound judgment" (2 *R. S.* 411, § 13, subd. 5), were either
actuated by improper motives or that the verdict rendered
did not express the truth of the matter as disclosed to them
in evidence.

The remaining propositions of the appellant are of a

more serious character. The *first* (*supra*) is founded upon the general rule that the fact that an offense has been committed, must be fully established before any one can be held to answer for it. " I would never," says Lord HALE (2 *Hale P. C.* 290) " convict any person of murder or manslaughter, unless the fact was proved to be done, or at least the body found dead." The proposition is elsewhere somewhat differently stated, as by Starkie (1 *Stark. on Ev.* 575), that upon charges of homicide the accused shall not be convicted unless the death be first distinctly proved either by direct evidence of the fact or by inspection of the body;" by Greenleaf (*Greenl. on Ev.* § 30), that even in cases of homicide, though ordinarily there ought to be the testimony of persons who have seen and inentified the body, yet this is not indispensably necessary in cases where the proof of the death is so strong and intense as to produce the full assurance of moral certainty; in Ruloff *v.* People (18 *N. Y.* 179), that in order to warrant a conviction of murder there must be direct proof either of the death, as by the finding and identification of the corpse, or of criminal violence adequate to produce death, and exerted in such a manner as to account for the disappearance of the body. It is also said that the *corpus delicti* in murder has two components : death as the result, and the criminal agency of another as the means. It is only where there is direct proof of one that the other can be established by circumstantial evidence. And by the Code of Criminal Procedure the degree of proof in such cases is clearly stated by the provision (§ 181), that " No person can be convicted of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of killing by the defendant as alleged, are each established as independent facts, the former by *direct proof* and the latter beyond a reasonable doubt.

This statute regulates the practice of the courts as to matters of evidence, signifying what weight is to be given to the testimony admitted, and the appellant claims that its prohibition applies to the time of the trial, without regard

to the time when the offense was committed, whether before or after the passage of the law. It does, unless restricted by the act itself. The court below were of opinion that it was so limited, and that the provisions of section 181, as they now read, do not apply. The homicide was committed January 10, 1882. The Penal Code took effect December 1, 1882 (§ 727), and it was provided (§ 2) that "no act or omission begun after the beginning of the day on which this Code takes effect as a law, shall be deemed criminal or punishable, except as prescribed or authorized by this Code, or by some statute of this State not repealed by it. Any act or omission begun prior to that day may be inquired of, prosecuted and punished in the same manner as if this Code had not been passed." Does the latter clause include the provision of section 181? An "act" criminal in its nature "may be inquired of" by various courts upon whom jurisdiction is conferred "to inquire," through the intervention of a grand jury, concerning it; or such inquiry may be made in certain cases through an examination before a magistrate, but in either case the "inquiry" relates to a proceeding before indictment found or trial had; prosecution relates to the warrant, the arrest, the indictment and other proceedings following the "inquiry" and before punishment, and the manner of so doing is regulated by the Code of Criminal Procedure (*Penal Code*, § 8). Neither relates to, or within their common meaning includes the evidence which may be given, or the degree of proof required upon the inquiry or during the prosecution to secure a conviction and punishment. The section (181) enacts a rule of evidence applicable, we think, upon the trial to all cases within its terms, and is not dependent upon the time of the commission of the offense. It, therefore, is properly invoked by the appellant.

But even under its provisions the plaintiff's accusation was well established. Evidence is the medium of proof; proof is the effect of evidence. Here the evidence of circumstances identifying the body of the dead man was of a.

conclusive nature and tendency. Vandercook, on the morning of the day named in the indictment (January tenth), was seen in the neighborhood of the defendant's cabin, and was then going towards it. In the evening of that day a neighbor going to Beckwith's cabin, and before reaching it, "smelt something burning," and on entering found Beckwith tending a large fire in his stove already hot, and from which came, he says, "a sizzling noise." Beckwith explained that he was "burning pork rinds," and was preparing "to bake." At some time between that evening and the twelfth of January he disappeared, and on that day neighbors, under the direction of an officer, burst open the door of his cabin and searched the interior. Pieces of human bones, part of the skull and fingers, and of the hands and feet, were found among the ashes in the stove, and in another part of the cabin the remaining fragments of a man's body cut to the length of stove wood. An axe was found, bloody and bearing upon it hair of the color of Vandercook's. There was found clothing (with blood on it), also proven to be his—"a coat and vest, an arctic, a boot and pair of pants." The fragments of the body, when put together, outlined, so far as they went, a man of Vandercook's size and appearance. The head was missing; the left hand and both feet gone; one of the lungs had been punctured with a knife or other sharp instrument; entering near the shoulder, it penetrated through into the lungs with a downward and forward thrust from behind. Witness says, "I traced the wound through the coat and vest, and shirt directly; it corresponded with the same wound that I traced through the body into the lung."

There was also in evidence the statements of the defendant made voluntarily to persons who visited him in jail, to one that Vandercook came into his house and "got hurt," and to another that he came in and "got killed."

After Vandercook was seen on the morning of the 10th of January going towards the cabin of Beckwith, he did not return to his home, nor, so far as the evidence discloses, was

he afterwards seen alive, save by Beckwith.  The confession of Beckwith was admissible in evidence (*Code Crim. Pro.* § 395; People *v.* Jaehne, 103 *N. Y.* 199; 4 *N. Y. Crim. Rep.* 478), and, with the testimony already in, there was "direct proof," within the meaning of the statute, of the death of the person alleged to have been killed.

We are also of opinion that the evidence fully warranted the finding of the jury that Vandercook was killed by the defendant, and that the killing was premeditated and deliberate.  It was preceded by threats disclosing that intention, and which were repeated up to within a short time before the homicide.  They do not, it is true, establish the guilt of the defendant, but they show that the act committed by him, and otherwise proven, was thought of beforehand, and so premeditated.  There was the intent to kill, and there was malice.  The evidence shows also that the action of the defendant concurred with his intent.  The wound through the back was not, so the surgeon says, the fatal blow, although directed against a mortal part, and the condition of the axe, infected with the blood and hair, shows that another instrument was resorted to for the purpose, as may be inferred, of completing the work, in the doing of which the knife had failed.  The character and course of that wound disclosed an attack from behind, made, it may be, from some place of concealment, as at the door, and suddenly, on the entrance of Vandercook; at any rate, there was the concurrence of a conscious purpose, as indicated by threats, the opportunity for their fulfillment, the choice of situation, and the use of different weapons until the intent was accomplished.  Then followed immediate but well-considered mutilation of the body into convenient parts for burning and its attempted destruction, but especially and first such parts of it as contained peculiar marks, as the head, the hand, the foot.  On the same day, falsehood by Beckwith as to the thing burning in the stove and the going away of Vandercook, his own flight, taking with him all articles of value or of use from the pockets of the dead man.  These are among the circum-

stances which might well lead the jury to the conclusion that there was on the part of the defendant malice and an intention to kill, and that the killing by him of Vandercook was in pursuance of premeditation and deliberation, rather than the effect of sudden anger and without design. They were left to the jury after a charge to which no exception was taken, and by which they were directed to solve every doubt in favor of the defendant. They have also been dwelt upon by the General Term, and after discussion by the learned and experienced judges of that court, a conclusion was reached that the trial judge did not err in leaving the question to the jury as one presented upon evidence sufficient in some proper view to justify a conviction. We agree in that conclusion, and think it unnecessary to add more, or repeat, the reasons expressed by the majority of that court (45 *Hun*, 422, and *supra*, p. 147) affirming the conviction. The case is now a second time before us. The record on the first occasion (103 *N. Y.* 361; 5 *N. Y. Crim. Rep.* 222), contained testimony given by the defendant. Its omission makes no room for a change in the conclusion then reached, for the essential circumstances in evidence, as they bear upon the proposition presented by the issue, remain the same. They have also been examined by us with an inclination *in favorem vitæ*, in view of the authority conferred (*Laws of* 1887, chap. 493. amending § 527 of the Code of Criminal Procedure) since the former decision was rendered, but we are not satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial.

We are therfore constrained to say the appeal fails, that a new trial should be denied, and the conviction and judgment affirmed.

All concur.

Judgment affirmed.

NOTE.—Under section 181 of the Penal Code, direct proof of the death of the victim is required. The identity of the person killed may be established by circumstantial or indirect evidence. People v. Palmer, 109 *N. Y.* 110, also reported *infra*.

For authorities on premeditation and deliberation, see note to a former appeal in this case, at 5 *N. Y. Crim. Rep.* 232.